IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) ) ) | Criminal No.   5:19-cr-00215-NAM; 5:18-cr-00244-NAM; and 5:09-cr-00592-NAM |
| | ) ) | |
| **v.** | ) ) | |
| **DONALD GEISS, JR.,** | ) ) | |
| **Defendant.** | ) ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED
MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)**

Undersigned counsel for the United States files this memorandum in opposition to defendant Donald Geiss, Jr.'s Renewed Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) (hereinafter, the "Motion"). Dkt. 49.[1] As explained further below, regardless of Geiss's medical history, his claim fails on the merits because he remains a danger to society. Accordingly, the government respectfully urges this Court to deny Geiss's Renewed Motion for Compassionate Release in its entirety.

**I.   Factual and Procedural Background**

On June 10, 2019, Geiss pled guilty to the following counts: Counts 1 and 2 of the indictment in Case No. 5:18-cr-00244-NAM (hereinafter, the "Indictment"), charging wire fraud in violation of 18 U.S.C. § 1343; Counts 4 and 5 of the Indictment, charging aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1); and Counts 1 and 2 of the information in Case No.

---

[1] Geiss filed copies of his Renewed Motion for Compassionate Release on the dockets in Case Nos. 5:18-cr-00244-NAM; 5:19-cr-00215-NAM; and 5:09-cr-00592-NAM. All citations in this brief to docket entries are to those in Case No. 5:18-cr-00244-NAM, unless otherwise noted.

5:19-cr-00215-NAM (hereinafter, the "Information"), charging wire fraud, in violation of 18 U.S.C. § 1343. *See* Dkt. No. 20. On December 9, 2019, this Court sentenced the defendant to a total term of imprisonment of 65 months, consisting of concurrent sentences of 41 months on each of Counts 1 and 2 of the Indictment and Counts 1 and 2 of the Information; and 24-months on Counts 4 and 5 of the Indictment, to be served concurrent to each other and consecutive to all other counts. Dkt. No. 36. This Court also ordered Geiss to pay a total of $167,016 in restitution to 8 victims and to pay a $600 special assessment. *Id.* Finally, this Court sentenced Geiss to serve a 3-year term of supervised release upon release from imprisonment. *Id.*

Geiss was on federal supervised release for a prior fraud conviction when he committed the crimes charged in the Indictment and Information, and he was charged separately with violating the terms of his supervised release. Following Geiss's admission to the supervised release violation, this Court sentenced him on December 9, 2019, to a 6-month term of imprisonment, to be served consecutive to the 65-month sentence on the Indictment and Information described above. *See* 5:09-cr-592-NAM, Dkt. No. 32.

Geiss is currently incarcerated at USP Canaan, in Wayne County, Pennsylvania, and the "Find an Inmate" feature of the Bureau of Prisons website lists Geiss's projected release date as August 31, 2023.[2]

Geiss first sought compassionate release from this Court on April 8, 2020. Dkt. No. 39. This Court denied Geiss's request because he failed to exhaust his administrative remedies as required by 18 U.S.C. § 3582(c)(1)(A). Dkt. No. 42. Geiss moved for reconsideration without

---

[2] *See* https://www.bop.gov/inmateloc/ (last visited June 23, 2020).

curing his administrative exhaustion problem, Dkt. No. 44, and this Court again denied Geiss's motion, Dkt. No. 48.

Geiss finally sent a request for compassionate release to the warden of his facility, which was denied, *see* Dkt. No. 49-1, and he now renews his motion for compassionate release from this Court, Dkt No. 49. The government continues to oppose Geiss's Motion.

## II.    <u>Relevant Law</u>

In general, district courts "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c)(1)(A)(i). Before the passage of the First Step Act of 2018, which amended § 3582(c)(1)(A), *see* P.L. 115-391, 132 Stat. 5194, at § 603 (Dec. 21, 2018), district courts could reduce an offender's term of imprisonment under § 3582(c)(1)(A) only upon a motion by the Director of the Bureau of Prisons (hereinafter, "BOP"). *See, e.g.*, *United States v. Ebbers*, 432 F. Supp. 3d 421, 422 (S.D.N.Y. 2020) ("Until passage of the First Step Act, only the Bureau of Prisons ("BOP") could bring a motion for compassionate release."). A decision by BOP not to make such a motion was unreviewable. *See, e.g.*, *Salvagno v. Dir. Bureau of Prisons*, No. 3:17-cv-318, 2017 WL 5159214 at *4 (D. Conn. Nov. 7, 2017) (unpublished) ("This Court agrees with the majority of district courts and Courts of Appeals that it does not have the authority to review the BOP's decision declining to move for compassionate release on the petitioner's behalf under § 3582(c)(1)(A)(i)."). Where the BOP did make a motion for a reduced sentence, a district court could only grant the motion on a finding that the request was justified by "extraordinary and compelling reasons." *See id.*

The Sentencing Reform Act of 1984 required the U.S. Sentencing Commission to set the definition of "extraordinary and compelling reasons." *See* Pub. L. 98-473, § 217(a), 98 Stat. 1837, 2019 (enacting 28 U.S.C. § 994). That Act directed the Commission to promulgate "general policy

3

statements" regarding any "aspect of sentencing or sentence implementation" that would further the purposes of 18 U.S.C. § 3553(a)(2), including "the appropriate use of . . . the sentence modification provisions set forth in" § 3582(c). 28 U.S.C. § 994(a)(2)(C). More specifically, 28 U.S.C. § 994(t) provides:

> The [Sentencing] Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of Title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.

The Sentencing Commission fulfilled these obligations through its policy statement at U.S.S.G. § 1B1.13 and accompanying Application Notes (hereinafter, the "CR Policy Statement"). The CR Policy Statement broadly parallels the language of § 3582(c)(1)(A), including the requirement that the reduction must be warranted by "extraordinary and compelling reasons." *See* U.S.S.G. § 1B1.13(1)(A). It also requires a determination that "the defendant is not a danger to the safety of any other person or to the community." *See* U.S.S.G. § 1B1.13(2).

Application Note 1 to U.S.S.G. § 1B1.13 sets forth the categories of "extraordinary and compelling reasons" that may justify compassionate release under § 3582(c)(1)(A):

> [E]xtraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A) Medical Condition of the Defendant.—
>
>> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time-period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>>
>> (ii) The defendant is—
>>
>>> (I) suffering from a serious physical or medical

4

> condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> (B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
>
> (C) Family Circumstances.—
>
> (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
>
> (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
>
> (D) Other Reasons.—*As determined by the Director of the Bureau of Prisons*, there exists in the defendant's case an extraordinary and compelling reason other than or in combination with, the reasons described in subdivisions (A) through (C).

(Emphasis added.) To provide guidance in connection with the final "Other Reasons" category listed in the CR Policy Statement, the BOP has issued Program Statement 5050.050, entitled, "Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. § 3582 and 4205(g)." The BOP Program Statement provides the following substantive grounds upon which BOP may agree to make a motion for a sentencing reduction under § 3582(c)(1)(A)(i): medical circumstances (including inmates with terminal or debilitated medical conditions); advanced age; death or incapacitation of a family member caregiver of an inmate's child or children; and incapacitation of a spouse or registered partner. *Id.*

The First Step Act's amendments to § 3582(c) allow a defendant to file a motion for a

reduced sentence directly with the district court, but only if BOP refuses to grant relief or declines

to act within 30 days of an inmate's request. Importantly, these amendments did not modify the

statutory provision requiring that district court decisions granting sentencing reductions must be

consistent with the CR Policy Statement:

> The court may not modify a term of imprisonment once it has been imposed except that . . . in any case . . . the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the ward of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . *and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission*.

18 U.S.C. § 3582(c) (2018) (emphasis added). The Sentencing Commission, which lacks a quorum

and cannot currently amend the sentencing guidelines, *see United States v. Adams*, 934 F.3d 720,

729 (7th Cir. 2019), has not modified its CR Policy Statement in the wake of the First Step Act.[3]

*See* U.S.S.G. § 1B1.13 & cmt. n1.

## III.   **Discussion**

At the present time, it is apparent that, but for the COVID-19 pandemic, Geiss would

present no basis for compassionate release. His medical ailments are well-controlled and do not

present any impediment to his ability to provide self-care in the institution. The only question with

---

[3] BOP Program Statement 5050.050 has been modified since the passage of the First Step Act, but these changes do not appear to affect the substantive categories under which BOP may agree to make a motion for a sentencing reduction under 18 U.S.C. § 3582(c)(1)(A)(i).

respect to Geiss's medical conditions, then, is whether the risk of COVID-19 changes that assessment.[4] The government acknowledges that Geiss's diabetes presents a risk factor identified by the CDC as heightening the risk of severe injury or death were the inmate to contract COVID-19 such that it presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility," as stated in § 1B1.13, cmt. n.1(A)(ii), in that at this time Geiss's ability to provide self-care against serious injury or death as a result of COVID-19 is substantially diminished, within the environment of a correctional facility, by the chronic condition itself.

However, Geiss is still not entitled to relief. This Court must consider all pertinent circumstances, including Geiss's danger to the community and all relevant factors under 18 U.S.C. § 3553(a). As the movant, Geiss bears the burden of showing that he is entitled to compassionate release. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue"); *United States v. Ebbers*, 432 F. Supp. 3d 421, 426 (S.D.N.Y. 2020) ("The defendant has the burden to show he is entitled to a sentence reduction."). In light of all relevant facts, Geiss cannot satisfy this burden.

At present, Geiss's diabetes is appropriately managed by BOP, *cf. United States v. Ramos*, 2020 WL 1685812, at *2 (S.D.N.Y. Apr. 7, 2020) (denying compassionate release motion where defendant with "chronic and severe asthma" in part because the inmate's condition was being

---

[4] As noted above, Geiss did finally seek compassionate release from the warden of his facility, which was denied, *see* Dkt. No. 49-1, so the government is not contesting Geiss's exhaustion of administrative remedies pursuant to 18 U.S.C. § 3582(c)(1)(A), and this Court therefore has authority to resolve the merits of Geiss's compassionate release motion.

controlled and treated while incarcerated), which is also engaged in strenuous efforts to protect inmates against the spread of COVID-19, *see, e.g.*, Dkt. No. 47-1; https://www.bop.gov/coronavirus/ (last visited June 22, 2020). Geiss's facility, moreover, continues to report no positive COVID-19 cases among its inmate population, *see* https://www.bop.gov/coronavirus/ (last visited June 22, 2020), which was also true several weeks ago, Dkt. No. 47-1 at 12, despite Geiss's prediction that imminent infection was inevitable, *see* Dkt. No. 39 (claiming on April 8, 2020 that "[w]aiting 30 days could be disastrous" and "carries the risk of catastrophic health consequences" to Geiss). By contrast, the disease remains sadly rampant in Onondaga County, New York, where Geiss intends to return to live. To date, there have been approximately 2,576 confirmed cases of COVID-19 in Onondaga County, including approximately 479 hospitalizations and approximately 180 deaths. *See* https://covid19.ongov.net/data/ (last visited June 22, 2020). *Cf. United States v. Condon*, 2020 WL 2115807, at *2-4 (D.N.D. May 4, 2020) (denying compassionate release where the inmate's facility had no confirmed COVID-19 cases and where the state she proposed to reside had reported 1,225 cases and 25 deaths, despite the defendant's claims to suffer from "asthma, chronic obstructive pulmonary disease, cardiovascular disease, hepatitis C, hypertension, and hidradenitis suppurativa (an inflammatory skin disease that is frequently described as an auto-immune disorder)").

Geiss's request to live at "home" in Syracuse also fails to address key details about his living arrangements, prospect for avoiding infection, and access to health care. *Cf. United States v.* Harris, 2020 WL 1969951 at *1 (M.D. Fla. Apr. 24, 2020) (explaining that a release plan should include "minimum information like where [the inmate] will live, how he will support himself, where he will receive medical treatment, and how he will pay for treatment if released"). Indeed,

the extent of Geiss's release plan is as follows: "If released, Mr. Geiss would live with his wife and children in Syracuse. His wife, Julie, is willing to drive to Pennsylvania to pick him up at USP Canaan." Dkt. No. 49 at 4. This is identical to the way in which Geiss described his release plan in his original compassionate release request on April 8, 2020. *See* Dkt. No. 39 at 20. As the government has already pointed out, this "plan" fails to answer basic questions, such as:

1. How Geiss can ensure that nobody in his family is infected with COVID-19;

2. Whether Geiss's wife or any of his children work outside the home such that they might bring the virus home;

3. Where and how Geiss will have access to adequate medical care without being at risk of infection; and

4. How the Probation Department could meaningfully supervise Geiss upon release.

*See* Dkt. No. 47 at 9. As the government has also previously pointed out, Geiss fails to provide pertinent information to this Court regarding the level of medical care his diabetes requires, whether his diabetes has caused other health problems to surface, or what the effect of his [non-existent] release plan would be on his diabetes. *Id.* As Geiss bears the burden of showing that he is entitled to compassionate release, Geiss's refusal to provide this Court with information about these issues that are central to his claim for compassionate release cuts heavily against his request.

Even more significantly, however, Geiss's offense conduct and criminal history disqualify him for compassionate release, as his career as a con artist shows that he poses an economic danger to society if released. *Cf. United States v. Reynolds*, 956 F.2d 192, 192 (9th Cir. 1992) ("[D]anger may, at least in some cases, encompass pecuniary or economic harm.").

Geiss has demonstrated a penchant for deceiving and defrauding those closest to him (or, at least, those to whom he should be close). In 2009, for example, as part of an apparent bid to defraud well-wishers out of money by claiming that he had cancer, Geiss told this same false tale

9

to his children, who were then living with their mother (Geiss's ex-girlfriend). *See* PSR ¶¶ 82-84 & 101. The children's mother sought counseling for the children as a result. *See id.* ¶ 101. Geiss similarly convinced other family members that he had cancerous "masses" throughout his body and that he was on the brink of death. PSR ¶¶ 107-111. When Geiss's parents came to believe his condition was "grave," they gave him $10,000. PSR ¶ 111. As part of a separate scheme, Geiss reportedly collected $35,000 from family members after telling them he needed the money to pay for his son's surgeries, even though Medicaid covered the medical bills such that Geiss and his son's mother had no out-of-pocket expenses. *Id.* ¶ 101.

Geiss did not limit his fraud schemes to his family circle, of course. Between 2001 and 2007, Geiss stole more than $1.6 million from his employer by "submitting phony invoices and bills to receive payments for services which had never been performed by the fictitious vendors he created." PSR ¶ 78. Based on this conduct, Geiss pled guilty to tax evasion and conspiracy to launder the proceeds of mail and wire fraud, and in June 2010 this Court sentenced Geiss to a total term of 72 months' imprisonment, to be followed by three years of supervised release. *See id.*

Geiss was released from the Bureau of Prisons on August 31, 2015, and he began serving his supervised release term in Syracuse, New York. *Id.* Less than a year later, while he was still on federal supervised release, Geiss adopted an alias and developed and executed a scheme to defraud a local business owner, B.S.G., by claiming that he (Geiss) "was a private equity investor seeking to make investments in Central New York" who was hoping to buy B.S.G.'s business. Dkt. No. 20 ¶ 5(a). Based on the elaborate and convincing nature of this scheme, B.S.G. loaned Geiss $141,000. *Id.* To lull B.S.G. into believing that repayment would be forthcoming, Geiss developed an even more elaborate and complex scheme to convince a separate victim, B.N., that he (Geiss) "was negotiating the sale of a computer algorithm to a well-known multinational finance and

insurance corporation in New York." *Id.*  ¶ 5(b). To accomplish this, Geiss "drafted, forged, and transmitted numerous documents, including electronic mail messages, text messages, and signed documents, using the names and personal information of two actual employees of the insurance company," all without authority. *Id.* Geiss used this weeks-long ruse to convince B.N. to send money to B.S.G. and to yet a third fraud victim. *Id.* ¶ 5(d)-(f). That third victim, R.G., had paid Geiss $6,500 to purchase heavy equipment belonging to B.S.G. (which was not for sale and which was never delivered to R.G.) to which Geiss had access based on his claimed interest in purchasing B.S.G.'s business as an investment. *Id.*

Geiss wrapped other victims into his web of lies as well, including by creating and using an alias to convince some victims to purchase online video game accounts on his behalf (for which Geiss did not reimburse them) and others to buy discount airline tickets (which did not exist). *See id.* ¶¶ 5-6. In short, Geiss is a veritable entrepreneur in the world of scams and swindles, and he has no compunction about creating and using aliases to aid and hide his crimes.

Geiss has devoted at least the last 19 years of his life to defrauding people at every turn, and this life of crime has been interrupted only by his time in prison, which did not reform him previously and is unlikely to have made a difference this time. Indeed, having unscrupulously developed and executed a variety of fraudulent schemes while on federal supervised release, Geiss can be expected to do so again if he is prematurely unleashed onto the unsuspecting public.

The current pandemic would be a tailor-made opportunity for someone with Geiss's temperament and skills to defraud vulnerable individuals and government programs, particular since government agencies and charitable organizations are working quickly to inject billions of dollars into the economy through a variety of aid programs. Geiss cannot be trusted to turn over a new leaf, particularly at a time when the ability to monitor and supervise him will necessarily be

limited.[5]

### IV.  <u>Conclusion</u>

For the foregoing reasons, the government respectfully urges this Court to deny Geiss's Renewed Motion for Compassionate Released based on his lengthy career as a con man and for the reasons described above. Geiss earned every month of his current sentence, and he should be required to serve it in full (or at least until he qualifies for home confinement from BOP, if ever).[6]

Dated: June 23, 2020                             Respectfully submitted,

                                                 GRANT C. JAQUITH
                                                 United States Attorney

                                                 /s/ Michael F. Perry
                                  By:            _____
                                                 Michael F. Perry
                                                 Assistant United States Attorney
                                                 Bar Roll No. 518952

---

[5] In the event this Court orders Geiss's release, the government respectfully requests, at a minimum, that any such order be stayed until BOP (a) quarantines Geiss for a period of 14 days; and (b) medically clears him for release, whichever comes second, in order to minimize the possibility of any spread of COVID-19 to the public.

[6] As previously explained in a declaration submitted by BOP attorney Jonathan Kerr, BOP is going through the process of automatically reviewing inmates for home confinement, a form of relief separate and apart from compassionate release that is only within the authority of BOP to grant. *See* Dkt. No. 47-1 ¶¶ 3-4.